IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 07-20040 Ma/P |
| v. | ) |
| | ) |
| BERNARD AVERY, JR. | ) |
| | ) |
| Defendant. | ) |

---

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

---

Before the court by order of reference is defendant Bernard Avery, Jr.'s Motion to Suppress, filed April 10, 2009. (D.E. 196.) The United States ("government") filed a response in opposition on April 21, 2009. On May 1 and May 27, 2009, the court held suppression hearings on the motion. Present at the hearings were Assistant U.S. Attorney Dan Newsom, defendant Avery, and his counsel, K. Jayaraman. The court heard testimony from Officer William S. Priddy, Officer Charles Cathey, and Detective Dexter Moses from the Memphis Police Department, Dr. John Hutson, Dr. Jennifer Adams, Dr. Robert Cochrane, Ronnie Coleman of the U.S. Marshals Service, and defendant Avery. The court also admitted into evidence fifteen exhibits. At the conclusion of the May 27 hearing, the court granted Avery's request for leave to submit a post-hearing brief after he had an opportunity to review Jencks materials and to order and review the transcripts from the trial of

one of his co-defendants, Eddie Lymas.[1]  Avery's trial is currently set for January 4, 2010.

The court has now considered the memoranda of law filed in support of and in opposition to the motion to suppress, Avery's post-hearing brief and the government's response, the exhibits presented at the suppression hearings, the testimony of the witnesses, the findings and opinions of all of the mental health professionals who evaluated Avery, and the applicable law.  The court hereby submits the following proposed findings of fact and conclusions of law, and recommends that the motion to suppress be denied.

### I.  PROPOSED FINDINGS OF FACT

**A.   The Vehicle Stop**

On the morning of December 29, 2006, three armed individuals robbed the Memphis Area Teachers Credit Union at 1364 North Watkins, in the north part of Memphis, Tennessee ("Credit Union"). During the robbery, one of the robbers took a gun from the security guard who was on duty at the Credit Union.  A fourth individual waited outside of the Credit Union and drove the getaway vehicle. Law enforcement later obtained videotape recordings from security cameras stationed outside the Credit Union, which showed the three robbers entering a van and fleeing the scene.  Investigators later

---

[1]Lymas was found not guilty by a jury on all charges on February 27, 2008.

determined that the van was an older model, green Mercury Villager and had a black luggage roof rack, matching hub caps, and a temporary "drive-out" tag located on the right passenger side of the rear windshield.

On January 8, 2007, Raymond Brady and his wife were walking their dog when an armed individual attempted to rob them, and in doing so, fatally shot Brady. The shooter ran to a nearby getaway van, jumped into the passenger side, and fled from the scene. According to the investigation, ballistics tests confirmed the gun used in the shooting was the same gun taken from the security guard during the robbery of the Credit Union on December 29.

On January 11, 2007, two armed individuals robbed an AmSouth Bank located at 2595 James Road, in the north part of Memphis. Two others, acting as a lookout and getaway driver, remained with the vehicle – a green Mercury Villager van with a drive-out tag on the right side of the rear windshield. During the robbery, the van was positioned in a stall of a carwash close to the bank. A videotape recording later obtained by investigators from carwash security cameras showed a female driver and a male passenger exiting the van and acting as if they were washing the van while keeping watch on the bank.[2] The male passenger was wearing a red t-shirt with a

---

[2]The videotape from the carwash was not offered as evidence at the suppression hearings. However, Dr. Jennifer Adams testified that she watched the videotape during her evaluation of Avery and could identify Avery as the male passenger of the van who appeared to be watching the bank. (5/27/09 Tr. at 119.)

large print design on the front.  The videotape showed the two bank
robbers quickly entering the van and the van driving away.

In response to these robberies, the Memphis Police Department
issued a Be-on-the-Lookout ("BOLO") alert for the green Mercury
Villager van.  Officers were directed to consider individuals found
with the van to be armed and dangerous.  According to the
uncontradicted testimony of Memphis Police Officer William S.
Priddy, shortly before midnight on January 12, 2007, he and other
officers were on patrol in the North Precinct in north Memphis in
search of the van when they observed a vehicle matching the
description in the BOLO and driving "in an area close" to where the
AmSouth Bank robbery took place.[3]  They contacted the police
dispatcher to verify the description of the van identified in the
BOLO.  The officers were informed by the dispatcher that the van
was an older model green Mercury Villager with a black luggage roof
rack, matching hub caps, and a drive-out tag on the right side of
the rear windshield.[4]  Since the van they saw met this exact

---

[3]Officer Priddy was a passenger in an unmarked police vehicle
driven by his partner, an Officer Stone.  In addition, Officer John
Quinn drove a separate marked police vehicle and assisted Officers
Priddy and Stone in looking for the van described in the BOLO.

[4]Officer Priddy testified that the location of the drive-out tag on
the right hand side of the rear windshield was unusual, because
based on his experience these temporary tags are normally put on
the driver's side of the rear windshield (left hand side). (5/1/09
Tr. at 45, 79-80.)  Although defense counsel questioned Officer
Priddy about whether the positioning of the drive-out tag was a
violation of any traffic laws, Officer Priddy testified that he did
not initiate the stop based on any traffic violations.

description, they initiated a stop of the vehicle.[5]

The officers approached the van cautiously with guns drawn, opened the front doors, and told the occupants to "freeze." Officers found defendant Avery in the front passenger's seat and a female, later identified as Sherika Avery (defendant's wife), in the driver's seat. Officer Priddy approached Avery and put his hand on Avery's chest to "keep[] him where he was." As Avery sat back in his chair, Officer Priddy immediately felt and saw an empty shoulder holster for a gun. Officer Priddy asked Avery, "Where is the pistol?" Avery responded that it was under his seat. Officer Priddy then looked down and saw the butt of a pistol by Avery's feet. Officer Priddy ordered Avery out of the van and placed him in handcuffs "[f]or my safety, I was not going to give him an opportunity to go for that gun." (5/1/09 Tr. at 85.) He then escorted Avery to the police car. One of the other officers removed Sherika Avery from the van and handcuffed her. The officers returned to the van and seized the pistol from underneath the front passenger seat. The officers also found $800 in cash and observed in the back seat of the van a red t-shirt with a large print design on the front.[6] The van was later towed from the scene

---

[5]Although the vehicle stop occurred near the intersection of Watkins and Corning in north Memphis, the officers initially saw the van twenty minutes earlier driving in a different area of the north Precinct. (5/1/09 Tr. at 43.)

[6]The officers were previously notified at the time that the BOLO was announced that one of the suspects involved in the robberies

and inventoried at the police station. Other items found during
the inventory search of the van included a small amount of
marijuana, ammunition, and a shotgun.[7]

**B.   Avery's Post-Arrest Statements**

On January 13, 2007, while Bernard Avery was in custody at the
Robbery Bureau, Memphis Police Detectives Dexter Moses and A. Parks
questioned Avery about the robberies. Detective Moses testified at
the suppression hearing that when he and Detective Parks initially
met with Avery, he advised Avery of his <u>Miranda</u> rights prior to any
questioning, that Avery acknowledged that he understood his rights,
and that he waived those rights and voluntarily agreed to talk
about the robberies. Specifically, Detective Moses testified that
the detectives provided Avery with a <u>Miranda</u> "Advice of Rights"
form and asked Avery if he could read and write, and that Avery
stated that he could. Avery read the Advice of Rights form out
loud, but because Detective Moses noticed that Avery had difficulty
reading some of the words, Detective Moses also read the rights
form to Avery. He asked Avery if he understood his rights and if
he had any questions. Avery responded that he understood his
rights. Avery then signed the rights waiver form, which was also
signed by the detectives.

---

wore a red t-shirt with a large print design on the front.

[7]Collective Exhibit 15 contains photographs of the 1993 Mercury
Villager van and items found in the vehicle, including the red t-
shirt, cash, firearms, and ammunition.

Over the next several hours, Avery provided the detectives with several detailed statements implicating himself and others in the Credit Union and AmSouth Bank robberies, as well as two other armed robberies of a Mapco Express gas station and a Maxi Foods store, which took place on December 27, 2006. At some point during the questioning, Avery told the detectives that he wanted to talk about the Raymond Brady murder. Avery provided a detailed statement about the Brady murder, in which he identified the shooter, described the events leading up to the murder, and admitted driving the same getaway van to assist the shooter flee the murder scene.[8] As Avery gave these statements the detectives typed down the information, and after completing each statement, the detectives reviewed them with Avery to determine if he wanted to make any changes. Once Avery confirmed that the typed statements were accurate, he wrote his initials on the first page and signed and dated the last page of each statement. According to Detective Moses, the information provided by Avery was consistent with information provided by other witnesses and depicted on the videotapes.

As for Avery's behavior during the detectives' questioning, on direct examination Detective Moses testified as follows:

Q: Can you tell the Court, as best that you can, and

---

[8]Detective Moses was not present when Avery later gave his statement about the Brady murder. That statement was taken by Detectives Parks and T.J. Helldorfer.

if you remember, what you observed about the Defendant on this day? I mean, his mood, his mannerisms, what, if anything, he did. That's one thing we're here today to determine.

A:  Well, when Mr. Avery first got there, you could tell he was nervous. He was – you know, it's just as many people that come in the robbery office. Once you're placed in the interview room, you get a little nervous. That's why I was asking, do you want to go to the restroom; would you like some food and water. And Mr. Avery advised that he would like something to drink. I gave him something to drink. I told him to calm down; we're going to get through this. I have a series of questions to ask you, and it won't take very long, but we're going to be here as long as you want us to be. I'm here, in essence, to work with you and find out what actually went on in these cases. I explained to Mr. Avery, and he kind of calmed down after a little while. He was sitting there. He kept playing with a piece of tissue, and you know . . .

Q:  Where did he get the tissue?

A:  We gave it to him. We provided him with the tissue. Like I say, he was nervous, and he was real protective of his wife [Sherika Avery]. He didn't want anything to happen to his wife, you know, because he told me they had kids and she was possibly pregnant at that time.

Q:  To your knowledge, does he have a wife and do they have children?

A:  Yes. I think they do. Yes, sir.

A:  Okay.

A:  But he was real protective of her. He was just – any way possible, he wanted her out of it so she could go home and take care of home. But I told Mr. Avery, I said, based upon the facts of the case and what we gathered, I don't know if that's going to be the case. But I told him that we'd go through it and whatever our investigation determines – but he was – he was nervous at first.

He kind of calmed down after he got some water in him and he ate a little bit, as well.  I think he bought some chicken or something.  He was all right after then.  He set up and told us details about everything we asked him.

Q:    Okay.    Was  he – to your  knowledge,  was  he complaining  of  hearing  voices  or  anything  like that?

A:    No, sir.

Q:    Did he appear to be – were his – does his responses appear to be responsive to the questions that were being asked?

A:    Yes, sir.

Q:    Did that change at any time?

A:    No, sir.

* * * *

Q:    Okay.  Did you threaten – did you or your partner, during any of that time that you were with the Defendant on January 13, threaten him in any way?

A:    No, sir.

Q:    Did you try to – did you make him promises?  For instance, did you promise him his wife is not going to be charged if he confessed or anything like that?

A:    No, sir.

Q:    Any kind of promises involving anything?

A:    No, sir.

Q:    Did he appear to understand what you were asking?

A:    Yes, sir.

Q:    Did he appear to understand that he was in trouble?

A:    Yes, sir.

-9-

(5/1/09 Tr. at 134-39.)   On cross-examination, Detective Moses testified that Avery had trouble reading the Advice of Rights waiver form, so Moses helped him with some words, read the form to him "line by line," and was told by Avery that he understood what those words meant.   (Id. at 168-69.)   Detective Moses further testified that after Avery's statements were typed up, he sat beside Avery and "went over his statement question by question as to what he said and how he said it.   And he said, Yes, that's it, that's it and that's it.   Any corrections that he wanted made, he would, um, he would tell them like that, You need to change this to this, and that was done."   (Id. at 172.)

Contrary to Detective Moses's testimony, Avery testified that although he provided several statements to the police, he only gave the statements because "he [Detective Moses] had told me he was going to let my wife go if I made a statement" and that Avery initialed and signed the statements because the detective told him "[h]e was going to let my wife go if I signed it."   (Id. at 197, 203-04.)   Avery testified that the detectives never notified him of his Miranda rights and never read his statements back to him.   (Id. at 204-05.)

C.   **The Mental Evaluations**

On February 1, 2007, a federal grand jury returned an indictment charging Avery and other co-defendants with the robbery of the Mapco Express and Maxi Foods, in violation of 18 U.S.C.

-10-

§§ 1951 and 2; the robbery of the Credit Union and AmSouth Bank, in violation of 18 U.S.C. §§ 2113(a) and 2; and using and carrying a firearm in furtherance of those robberies, in violation of 18 U.S.C. §§ 924(c) and 2.[9]

On March 23, 2007, Avery's counsel filed an unopposed motion requesting that the court order Avery to undergo a mental competency evaluation pursuant to 18 U.S.C. § 4241.  The court granted the motion on March 30, and pursuant to that order, Avery was evaluated by psychologist Jason V. Dana at the Metropolitan Correctional Center in Chicago, Illinois.  In his report, Dr. Dana noted that Avery reported experiencing auditory hallucinations, demonstrated "extremely poor memory," and "demonstrated multiple symptoms of a major mental illness (dementia due to head trauma and borderline intellectual functioning) that requires inpatient psychiatric intervention."[10]  (7/11/07 Forensic Report, Ex. 10 at

---

[9]At his bail hearing held on March 31, 2007, a Deputy Marshal reported to the court of an event in which Avery apparently became upset and attempted to eat his own feces while in Marshal custody. Defense counsel called Officer Ronnie Coleman to testify about this event at the suppression hearing.

[10]According to Avery's medical records, in 1999 he suffered a gunshot wound to his head when a gun discharged accidentally in his hand.  In a subsequent mental competency report submitted by Dr. Robert E. Cochrane, discussed infra, the circumstances surrounding the treatment of the gunshot wound was described as follows:

Medical records from the Regional Medical Center at Memphis ("Med Plex") were obtained.  On 06/28/99 Mr. Avery was seen in the emergency room following a self-inflicted gunshot wound to the head with a .22 caliber firearm.  He did not experience loss of consciousness

3.)     According   to   the   results   of   the   Test   of   Nonverbal Intelligence,   Third   Edition   ("TONI-3")   administered   by   Dr.   Dana, Avery   had   an   "estimated"   I.Q.   of   63,   which   placed   Avery   "in   the borderline   to   mentally   retarded   range   of   intellectual   functioning." (Id. at 4.)   According   to   the   results   of   the   Wechsler   Memory   Test, Third   Edition,   Abbreviated   Version   ("WMS-III-A"),   Avery   had   an Immediate   Memory   Score   of   60,   a   Delayed   Memory   Score   of   59,   and   a Total   Memory   Score   of   57,   which   "all   indicate   that   Mr.   Avery's memory   functioning   falls   in   the   severely   impaired   range   of ability."   (Id.)   Dr.   Dana   concluded:

At   the   present   time,   Mr.   Avery   appears   to   be   suffering

---

during   the   events.     Further,   he   insisted   he   was   not suicidal   but   the   firearm   discharged   accidentally   when   he was   "playing"   with   a   gun.     This   was   confirmed   by   his girlfriend,   who   indicated   she   was   with   him   when   the   gun went   off   accidentally.     Mr.   Avery   was   oriented,   alert, and   displayed   clear   speech.     CT   brain   scan   showed   right frontal   gunshot   wound   and   bullet   fragment   that   was "barely   under   the   surface   of   the   skull."     There   was   a small   amount   of   fragment   on   intracranial   subarachnoid hemorrhage.     Edema   was   noted   in   the   "right   parietal   lobe with   mild   subfalcine   herniation."   During   surgery,   it   was noted   the   bullet   pierced   the   skull   but   did   not   pierce   the dura,   which   was   completely   intact.     No   surgical complications   were   encountered   and   postoperatively   Mr. Avery's   hospital   stay   was   unremarkable.     Mr.   Avery   was seen   by   a   psychiatrist,   who   noticed   no   cognitive   deficits or   indication   of   a   psychiatric   condition.     He   was diagnosed   on   06/30/99   and   seen   one   week   later   for   staple removal   at   a   local   clinic.

(3/25/08   Forensic   Report,   Ex.   14   at   3-4.)     Dr.   John   Hutson,   the clinical   psychologist   who   later   examined   Avery   at   defense   counsel's request,   testified   at   the   May   1   hearing   that   Avery   had   "a   very   mild hematoma,   absolutely   no   significant   problem"   as   a   result   of   the gunshot   wound.   (5/1/09   Tr.   at   237.)

from dementia due to head trauma, which meets criteria for a severe mental defect. Additionally, his ability to understand the legal proceedings and to properly assist his counsel appears to be severely impaired at this time. The defendant is believed to be appropriate for continued treatment and assessment at a psychiatric facility and does not appear appropriate for continuation of judicial proceedings at this time.

(Id. at 7.)   However, Dr. Dana observed that

due to the nature and severity of the deficits noted, malingering must remain a consideration for treating clinicians during the course of more comprehensive assessment and psychiatric intervention. His reported interpersonal history seems to contradict the presentation observed during evaluation, but conclusive evidence of malingering was not obtained during the assessment period.

(Id. at 6.)

On August 23, 2007, the District Judge held a competency hearing, at which Dr. Dana testified by video teleconferencing.[11] The court found Avery to be not competent and ordered that he be committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d)(1) for treatment "as it is necessary to determine whether there is substantial probability that in the foreseeable future he will attain the capacity to permit the trial in this cause to proceed." (D.E. 74.)   Pursuant to that order, Avery was transported to the Federal Correctional Complex - Federal Medical Center in Butner, North Carolina ("Butner Center"), for further treatment and evaluation.

---

[11]In his testimony, Dr. Dana essentially adopted the findings and opinions set forth in his report.

On March 25, 2008, the court and all counsel received a forensic evaluation report from Dr. Robert E. Cochrane, a forensic psychologist at the Butner Center.[12]  Dr. Cochrane indicated that while Avery claimed he did not know whether or not he ever attended school and that he could not read, records obtained from Memphis City Schools showed that he withdrew from school during the tenth grade, that he received average to below average grades, and that there was no indication he was ever diagnosed with a learning disability or received special education services.[13]  (3/25/08 Forensic Report, Ex. 14 at 2-3.)  Avery was administered a variety of psychological tests, including the Minnesota Multiphasic Personality Inventory - Second Edition ("MMPI-2"), an objective and well-validated questionnaire used to assess personality styles and symptoms of mental disorders; the Structured Interview of Reported Symptoms ("SIRS"), a test specifically designed to detect malingering of symptoms of mental illness; and the Test of Memory Malingering ("TMM"), a forced-choice measure designed to assess effort and motivation.  On the SIRS, Dr. Cochrane indicated the

_____

[12]Dr. Bryon Herbel, a psychiatrist at the Butner Center, provided psychiatric consultation during Avery's evaluation and also signed the report.

[13]At the May 1 hearing, Dr. Hutson testified that he was in the process of obtaining Avery's complete school records from Memphis City Schools, as he believed that the school system kept a separate set of records for students with learning disabilities which would not be reflected in the school records previously provided. However, since the suppression hearing no additional school records have been provided to the court.

-14-

results were somewhat equivocal, but suggestive of malingering. However, he found that the results of the MMPI-2 showed that Avery's profile was "strongly suggestive" of symptom exaggeration and that the results of the TMM demonstrated "clear evidence" of exaggeration of cognitive impairment. Dr. Cochrane concluded that Avery suffers from a mild/low-level psychotic disorder, namely Schizophrenia, that was in remission. Dr. Cochrane opined that Avery was competent to stand trial, although he noted that Avery would require ongoing psychiatric treatment in order to decrease any risk of relapse.[14]

On July 2, 2008, the government filed a motion styled Request for Pretrial Psychiatric Examination of Defendant Pursuant to Title 18, United States Code, Sections 4242 and 4247(b), and Rule 12.2(c), Federal Rules of Criminal Procedure. (D.E. 148.) The government filed this motion based on Avery's counsel's comments at the June 27, 2008 report date, during which counsel for Avery indicated that he wanted to have his client further evaluated and that he was going to provide the government with a notice of insanity defense pursuant to Fed. R. Crim. P. 12.2(a). The court granted the government's motion on July 9, 2008, and directed that Avery be transported to the Butner Center for the examination.

---

[14]On March 31, 2008, the Warden for the Butner Federal Correctional Center filed a Certificate of Restoration of Competency to Stand Trial, pursuant to 18 U.S.C. § 4241(e), indicating that Avery had been restored to competency.

-15-

Avery was re-admitted to the Butner Center on July 28, 2008.  On
October 21, 2008, a report was submitted pursuant to the court's
July 9 order.  (10/21/08 Forensic Report, Ex. 11.)  The report was
signed by Dr. Jennifer S. Adams (who at the time was a Predoctoral
Psychology Intern), Dr. Cochrane, and Dr. Herbel.[15]  The evaluators
opined that at the time of the alleged offenses, Avery was able to
appreciate the nature, quality, and wrongfulness of his actions:

> Mr. Avery was questioned at length about the discovery
> material, including his and the co-defendants' statements
> to police.  Mr. Avery provided details of the events
> related to the alleged offenses on three occasions.
>
> Mr. Avery acknowledged being involved in two bank
> robberies and two store robberies with three
> codefendants.  When asked what led up to these events, he
> indicated hearing voices telling him to "Rob Bank" to
> help pay for his mother-in-law's funeral.  He added that
> he also engaged in the robberies to decrease the voices
> that "hurts my head."  He added that "only way to stop
> the headache is listen to the voices."  He also
> spontaneously reported "I always listen to the voices."
> When asked at this time if he also ever gets a tingling
> or buzzing sensation in his body when hearing the voices
> (a bogus symptom), Mr. Avery responded "Yes.  I get dizzy
> and almost fall."  Mr. Avery indicated discussing the
> voices with his wife and the codefendants and explaining
> to them "what I was thinking about doing," who then
> agreed to participate in the robberies with him.  He
> described not having taken his psychotropic medication
> (risperidone and Wellbutrin) for some time before the
> offenses.  He also acknowledged that he began arguing and
> "started hitting her" (his wife) because he was smoking
> marijuana and using "X pills."  He did not recall whether
> or not he took an X-pill on any of the days of the
> robberies, and he denied any alcohol or other illicit
> drug use then.  During a later interview, he clarified
> that he heard a voice telling him to commit the first

---

[15]The report was signed by Dr. Adams as "Jennifer S. Adams, M.A."
However, Dr. Adams received her Ph.D. degree sometime in 2008.

robbery, but after that the codefendants "made me go along."

Throughout the interviews, Mr. Avery cast himself as a reluctant participant in the robberies who simply followed the instructions and advice of the others. For instance, he indicated his wife "went with me because she didn't want me to get in trouble," and that during one of the robberies he was so confused he could not recall how to drive, so one of the codefendants had to drive the getaway vehicle. He also stated that when exiting the bank he heard a voice telling him to throw down his weapon, which he proceeded to do. He claimed that his codefendants later chided and yelled at him for not picking up the dropped firearm and dropped money. However, this contrasted with Mr. Avery's report to the police, where he indicated that not he, but a codefendant, dropped the gun upon running out of the bank. He added "He told me to go get the gun, but my wife said get in the van. They were yelling. I started crying. We drove off." He reported that he felt scared at the time and was "Just doing what the voice told me to do." He described that the codefendants told him to wait in the car during the next robbery a few days later, and his wife Sherika came along "so I didn't get in trouble." He further stated that he wanted to "prove myself" since he "messed up" during the previous robbery. He then spontaneously added "She say she was going to send me to a psych place," a subject which resulted in further arguments between them.

Mr. Avery was also questioned about the report of him briefly speaking to a police officer at a McDonald's restaurant following one of the robberies. Mr. Avery described how he was questioned by an officer who noticed his holster and handgun as he entered the McDonald's. After showing the officer his permit for the weapon, he was allowed to proceed.

Finally, Mr. Avery was asked about his arrest. He reported "Riding down the street one day" in their van two weeks after the robberies when police pulled he and his wife over. He indicated some individuals "saw me on TV and the car wash" and he "knew police were looking for me." Regarding statements to police pertaining to the alleged homicide, he indicated informing police that he was threatened with physical harm by Mr. Lyams [sic] if he "snitched," and that the police promised to "protect

-17-

me."

* * * *

Regarding the first prong of the insanity test, Mr. Avery does suffer from a mental illness, namely Schizophrenia. While his condition is not as severe as many patients with this disorder, and there is ample data to suggest he was exaggerating his symptoms, there is sufficient evidence to suggest he meets criteria for Schizophrenia. However, based on all of the available information, there was no indication Mr. Avery was suffering from symptoms of his mental illness at or around the time of the offenses. There was also no evidence of substance use or acute intoxication. During police questioning, Mr. Avery never mentioned anything about symptoms or emotional problems he was having. Further, none of the codefendants nor the police reported anything out of the ordinary about his behavior or any complaints he had. He exhibited goal-directed behavior and typical criminal motivations for engaging in the illicit conduct, such as needing money to pay bills and funeral expenses. It was only when undergoing the current evaluation that Mr. Avery reported having other reasons for his conduct, including hearing voices instructing him to commit the robberies and being pressured to participate in the offenses. Up to that point, he only reported to professionals that his auditory hallucinations were depressive in nature (e.g., "kill yourself"). He had never described having command hallucinations to engage in criminal activity, like he is claiming at this time. His current accounts appear self-serving and inconsistent with his previous reports of psychiatric symptoms.

However, even if one were to accept that Mr. Avery was experiencing auditory hallucinations at the time of the crimes, his own accounts of his behavior, and descriptions by others, all consistently demonstrate he could appreciate not only what he was doing, but the quality and significance of his actions. Mr. Avery and the codefendants spoke in advance and planned the robberies. He described in detail his understanding of what he was doing when committing the robberies. His use of weapons is consistent with this understanding as well. Further, the mere fact he participated on multiple occasions with others in the offenses suggests he was aware of what was taking place. It is extremely rare for someone to be insane when codefendants are involved,

-18-

especially when they interact extensively with others to effectuate a crime. This type of planning and coordination is not typically seen among individuals suffering from severe psychotic symptoms.

Finally, Mr. Avery's actions and statements strongly suggest he was able to appreciate the wrongfulness of his conduct as well. For example, during each incident Mr. Avery and the others quickly fled the scene, suggesting he knew what he was doing was wrong and something for which he could be arrested. In fact, upon his arrest Mr. Avery recounted being aware that police were looking for him. Further, precautions Mr. Avery took during the robberies indicate he was aware of the wrongfulness of the activity. He pat searched one security guard for weapons and forced another guard to relinquish her weapon by threatening her with his firearm. Mr. Avery also engaged in covert behaviors to avoid detection, further suggesting his appreciation of the wrongful nature of the conduct. For instance, he acted as if he was washing his vehicle while two codefendants robbed the bank, and he pretended to be purchasing soda so the cashier would open the register in order for him to steal the money. Finally, Mr. Avery's expression of remorse for his conduct, as well [as] remorse over the death of the homicide victim, suggests he appreciated the wrongfulness of his behavior and that of his codefendant.

Based on the above information, it is our opinion that at the time of the alleged offense, Mr. Avery was able to appreciate the nature, quality, and wrongfulness of his actions.

(<u>Id.</u> at 15-18.)

On April 1, 2009, counsel for Avery filed a Motion to Authorize Retention and Excess Payment to Medical Expert/Psychologist, in which he argued that "Defendant intends to file a motion to suppress the statement obtained from the Defendant soon after his arrest," that "Defendant's competence at the time of his police questioning would be a germane issue for his suppression hearing," and that "Defendant would submit that retention of a

-19-

private medical expert/psychologist to evaluate the Defendant and obtain an expert opinion is thus imperative to effectively represent the Defendant in this matter." (D.E. 191 at 1-2.) Pursuant to this request, Avery was evaluated by Dr. John Hutson, a clinical psychologist, who in turn requested Dr. Geri Bishop, a psychologist, to administer a Wechsler Adult Intelligence Scale - IV ("WAIS-IV") to Avery. According to the results of the WAIS-IV, Avery has a full scale I.Q. of 54. (4/24/09 Letter from Dr. Hutson to K. Jayaraman, Ex. 9.) Dr. Hutson assessed Avery as having "very low functioning intellectually":

> The primary problem with Mr. Avery is that it was my impression that he was very low functioning intellectually. I asked him how many days there were in a year and he indicated that he did not know, but when pressed for an answer, he said, "approximately 240." When asked how many months there were in a year, he answered correctly that there were 12. When asked how many weeks there were in a year, he said he did not know, then when pressed, he said 150. When asked how many days there were in a week, he initially said eight, and was asked to name them. He said, "January, February, April," and was unable to say anything further. He was asked again and said seven, and he indicated that they were "Monday, Tuesday, Wednesday, Thursday, Friday, and Saturday." When asked how many weeks there were in a month, he said four. When asked if he were given an option of 10 years or 120 months as a sentence, he indicated that he did not know because he did not understand how many months there were in a year, although he previously had told me. It should be noted that he indicated that he has been locked up for 38 months, whereas my calculation indicates he has been locked up almost exactly 27 months.

(Id. at 2.)

Drs. Hutson, Adams, and Cochrane testified at the suppression

hearings.  Dr. Hutson testified that he had "some problems with" the tests that the evaluators at the Butner Center used to conclude that Avery was malingering. (5/1/09 Tr. at 235.)  For example, Dr. Hutson testified that the MMPI-2 test "requires a minimum of about a sixth grade reading ability" and that "[i]t's not valid with somebody who functions that low intellectually." (<u>Id.</u> at 201.) According to Dr. Hutson, during his evaluation of Avery he was not able to tell time using an analog clock, and did not know how many months are in a year or days are in a week.[16] (<u>Id.</u> at 207.)  He further testified that Avery's ability to reason was "almost nonexistent" and that "[a]nything over about a syllable, he could not read.  He knew enough [] phonetics to pronounce it, but he didn't know what the words meant.  And even then, his pronunciations were not correct.  In the Wechsler, she [Dr. Bishop] gives him a test, reading, and says his reading ability is virtually nil." (<u>Id.</u> at 208-09.)  However, when asked on direct examination by Avery's counsel whether he believes Avery understood his <u>Miranda</u> rights, Dr. Hutson testified as follows:

> Q:  Okay.  Now, I'm going to pass you what is marked and introduced into evidence as Exhibit 8.  This is a Waiver of Rights form.  You see Mr. Avery's signature there?
>
> A:  Correct.

---

[16]However, as clearly stated in the April 24 letter, Avery correctly answered questions about the number of days in a week, weeks in a month, and months in a year when "pressed" by Dr. Hutson.

Q:    All right.  Do you think Mr. Avery understood what he is signing, what is written in that statement?

A:    I frankly don't know.  The level of comprehension to understand Miranda rights is not very [high].  I didn't specifically go over them with him, but he did know what a lawyer did at the time I saw him, then of course he's been in the system at that point several years.

Q:    He did (inaudible).

A:    He did.

Q:    He did?

A:    He knew very generally that a lawyer was somebody to help him defend him in his case.

    * * * *

Q:    Okay.  Based on his I.Q. of 54 and his intellectual ability, do you think Mr. Avery was competent to make that [Miranda] waiver?

A:    I'm going to say yes, and this is why:  One, the word counsel is not in that form.  The word lawyer is.  I think you would have problems with the word counsel . . . .  As I said, it was two and a half years after the fact, but he also has been arrested before, nothing for anything this serious.  And when you have experience with a prior arrest, you probably have had Miranda rights, but even – I do know that in prior arrests, he has been evaluated and although considered borderline, he was considered competent, particularly with regard to understanding things like lawyers, so I'm going to say yes.

(Id. at 214-18.)[17]

---

[17]At Avery's bail hearing, the court learned that prior to his arrest on the instant offenses, he had been arrested on charges for assault, disorderly conduct, failing to appear for booking/processing, and various traffic violations.  The only charges that resulted in convictions were the traffic offenses.

Drs. Adams and Cochrane, however, both testified that they believed Avery was exaggerating his symptoms during their evaluations:

Q:  Can you tell the Court what kinds of testing was done?

A:  [] Yes.  There was a test of memory malingering called the TOMM.  . . .  He was also administered something called the Structured Interview of Reported Symptoms, also known as SIRS, and he was given the MMPI-2. . . .

With the SIRS, the Structured Interview of Reported Symptoms, this is a test that's designed to specifically detect malingering or exaggeration of the symptoms.  It works on the premise that you ask the person a bunch of questions about different psychiatric symptoms and some of them have some just bogus symptoms put in there.  You see if the person endorses those kind of things, and specifically during our interview with him – I guess that was sometime in August or September of 2008 – we just threw in one of those bogus symptoms to see what would happen and he endorsed it.

We said something about when you[] hear voices do you also hear a ringing or buzzing in your ear?  That's not a valid symptom of psychosis.  And he said, yes.  And if I can remember correctly, I think I even quoted exactly what he said.  Yes.  He stated, yes, I get dizzy and almost fall.  That's a bogus symptom.

People that hear voices aren't hearing a ringing or get a tingling or a buzzing sensation in their bodies.  That's a fake symptom.  So that's what the SIRS does.  You go through and you have some valid symptoms in there, but then you have a lot of bogus things thrown in there as well.  And you go through the whole test and you get them to answer and then you go back through and you ask them kind of how bad are the symptoms that they endorsed, and you look at that as well.

And if I remember correctly, he scored in the

-23-

- he had five of eight scales that were in the indeterminate range and two were in the probable malingering range and only one out of the eight scales was actually in the honest range. His total score indicated that he was malingering.

* * * *

Now the last test, the test of memory malingering, is a very interesting test. It looks like it is going to be a very difficult test. And it looks as though, you know, when a person looks at it they think, okay, this is going to be something that I need to fail if I want to look like I have problems.

So - but it's actually a very easy test. There's 50 items you go through it two times and essentially there's pairs of pictures that you're looking at or trials that you go through. And the nice thing about the TOMM is that it's normed or it's been based on individuals with severe cognitive deficits. Looking at how they score on this measure and then you compare other people's scores, like what do normal controls, people with no brain injuries, no mental retardation, no depression, nothing like that, what do they score?

Then we look at the severely impaired individuals and how they scored. What we see is even severely impaired individuals get at least 45 out of 50 answers correct. Mr. Avery scored 22 out of 50 the first time and 20 out of 50 the second time and nearly 97 - I think it's 97 percent of individuals on the second trial, even severely impaired individuals score better, not worse.

One of the indicators - one of the particular patients that they norm this on had a severe traumatic brain injury. So they had a subdural hematoma. The person had extreme difficulties with concentration, required a lot of care because she was so impaired, and she scored, if I remember correctly, she got 92 percent of the items correct. I mean, this is a very severely impaired individual.

* * * *

-24-

So we diagnosed him with Schizophrenia. We also noted that he – that he was malingering. That, yes, you can have Schizophrenia but you can also still malinger. It just means that you take, you know, your symptoms that you have and you just kind of exaggerate them and say that they're worse than they really area.

And that's really what seemed to be the case with Mr. Avery is that, you know, I mean, he claims he had amnesia for the events that occurred. He claimed not knowing very basic information and even mentally retarded individuals and people with a severe brain injury can remember things like the alphabet. You've learned it and heard it so many times, but Mr. Avery would say he could only get so far and then he forgot.

(5/27/09 Tr. at 35-44.) Dr. Adams also strongly disagreed with Drs. Hutson's and Bishop's opinion that Avery has a full scale I.Q. of 54 because "[a]n I.Q. test has no assessment of a person's motivation and performance, like what their mind state is going into the test. So to not assess a person's motivation prior to taking the test, you don't know if you're getting accurate results or not." (Id. at 89-90.) She did not test Avery's I.Q. "because all of the evidence suggested he was exaggerating his symptoms, which means that essentially it would have been a waste of time because we would not get an accurate estimate." (Id. at 90-91.) Dr. Cochrane's testimony was substantially similar to Dr. Adams's testimony, and he also believed that Avery's I.Q. scores were "quite remarkable, much, much lower than [Avery's] functioning and not at all consistent, in fact, with school records, with accounts, his speech patterns, with how others described him. It was just

-25-

completely inconsistent." (Id. at 140-43.)

At the May 27 hearing, Avery testified that he learned how to read and write in school, but that now he is unable to do so. (Id. at 200.) He testified that he cannot tell time using an analog clock. (Id. at 200-01.) He was unable to answer questions asked of him about the number of days in a week and in a month, months in a year, or hours in a day. (Id. at 201-02.) Avery testified that he believes his mental problems started after he suffered the gunshot wound to his head in 1999. (Id. at 209-10.)

## II.  PROPOSED CONCLUSIONS OF LAW

As set forth in Avery's opening brief and post-hearing brief, he raises two arguments in support of his motion to suppress. First, Avery contends that the police officers unlawfully stopped the Mercury Villager van and therefore all evidence seized from the van and any statements he made as a result of that unlawful stop should be suppressed. Second, he argues that he did not knowingly and voluntarily waive his Miranda rights.

## A.  Motion to Suppress Relating to Traffic Stop

In the first part of Avery's motion, he seeks to suppress all physical evidence seized from the van and his statement about the presence of the gun under his seat because, he argues, the van was unlawfully stopped.[18]  "An investigative stop of a vehicle is

_____

[18]Avery also contends that the series of statements he later gave to the detectives while in custody at the Robbery Bureau should be suppressed as fruits of the illegal vehicle stop.  Because the

-26-

permissible under the Fourth Amendment where the stop is supported by reasonable suspicion of wrongdoing."[19] United States v. Flores, 571 F.3d 541, 544 (6th Cir. 2009) (citing Terry v. Ohio, 392 U.S. 1, 22 (1968)).  In the Sixth Circuit, courts employ a two-part test to determine the legitimacy of an investigatory stop.  See United States v. Luqman, 522 F.3d 613, 616-17 (6th Cir. 2008); United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005).  First, a court must decide "'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.'"  Davis, 430 F.3d at 354 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993)).  "Reasonable suspicion must be 'supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'"  Flores, 571 F.3d at 541 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).  "The court should consider the 'totality of the circumstances' and evaluate whether the detaining officer had a 'particularized and objective basis' for suspecting wrongdoing."  Id. (quoting United States v. Arvizu, 534 U.S. 266,

---

court concludes that the vehicle stop and his subsequent arrest were not unlawful, Avery's contention that his post-arrest statements should be suppressed is similarly without merit.

[19]Avery argues that the stop was unlawful because the officers lacked probable cause to initiate the stop.  The court submits that the proper inquiry is whether the officers had reasonable suspicion to stop the van under Terry v. Ohio, 392 U.S. 1 (1968).

273 (2002)).   If the grounds for the investigatory stop were proper, the court must then determine "'whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" <u>Davis</u>, 430 F.3d at 354 (quoting <u>Garza</u>, 10 F.3d at 1245).

In this case, the police officers had reasonable suspicion that the van in question was the same van used as the getaway vehicle in the recent armed robberies and homicide.   According to the uncontradicted testimony of Officer Priddy – which the court finds to be credible – he observed the van shortly before midnight traveling in an area close to where the AmSouth Bank robbery took place the day before.   Prior to stopping the van, the officers contacted the police dispatcher to verify the description of the van and were informed that the van was an older model, green Mercury Villager with a black luggage roof rack, matching hub caps, and a temporary drive-out tag on the right side of the rear windshield.   The van they saw met this exact description.   These are specific and articulable facts which gave rise to reasonable suspicion that the van was used in the robberies, and therefore the totality of the circumstances supports a finding that the stop was reasonable and lawful under the first prong of <u>Terry</u>.

Moreover, the degree of intrusion was reasonably related in

-28-

scope to the situation at hand.  Based on the violent nature of the crimes allegedly committed by the robbery suspects and the van's connection to the Brady murder, the officers were told that the occupants of the van should be treated as armed and dangerous. Under the circumstances, the officers were reasonable in approaching the van with guns drawn and telling the occupants to "freeze."  By placing his hand on Avery's chest to secure Avery in his seat for the officers' safety, Officer Priddy did not exceed the proper scope of the Terry stop.

Once Officer Priddy saw the empty gun holster strapped to Avery's shoulder and then saw the butt of the pistol under Avery's seat, Officer Priddy had sufficient probable cause to arrest Avery in connection with the armed robberies.  United States v. Campbell, 486 F.3d 949, 957 (6th Cir. 2007) ("'Probable cause exists where the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" (quoting United States v. Sangineto-Miranda, 859 F.2d 1501, 1508 (6th Cir. 1988))).  In addition, once a custodial arrest has occurred, the officers may, "as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" without a warrant.  New York v. Belton, 453 U.S. 454, 460 (1981); see also Thorton v. United States, 541 U.S. 615 (2004).

Accordingly, the search of the van that uncovered the pistol and $800 in cash under Avery's seat was a lawful search incident to arrest.

With respect to Officer Priddy's question about the location of the gun, "when officers ask 'questions necessary to secure their own safety or the safety of the public' as opposed to 'questions designed solely to elicit testimonial evidence from a suspect,' they do not need to provide the warnings required by [Miranda]." United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007); see also New York v. Quarles, 467 U.S. 649, 655-56 (1984) (finding that police asking armed rape suspect "Where is the gun?" after chasing him into a supermarket was not a violation of Miranda); United States v. Talley, 275 F.3d 560, 564 (6th Cir. 2001) (finding that once an officer had seen a magazine and ammunition, he had reason to believe a gun was nearby and was justified, under Quarles, in asking "Where is the gun?" prior to administering a Miranda warning). The public safety exception applies "when officers have a reasonable belief based on articulable facts that they are in danger." Williams, 483 F.3d at 428. "For an officer to have a reasonable belief that he is in danger, at minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." Id. As Officer Priddy testified, once he felt and saw the empty gun

holster on Avery, for safety reasons he asked Avery about the location of the gun.  This, coupled with the information the officers previously received regarding the van's role in the armed robberies and homicide, provided Officer Priddy with a reasonable belief that Avery might have a weapon and that he or Sherika Avery might gain access to it.  The court finds that the officer was justified in asking Avery about the location of the weapon under <u>Williams</u>.

**B.   Motion to Suppress Relating to Post-Arrest Statements**

Avery moves to suppress the statements he gave to the detectives on the basis that he was incapable of making a knowing and voluntary waiver of his <u>Miranda</u> rights.  There are two dimensions to the court's inquiry as to whether a defendant has effectively waived his <u>Miranda</u> rights.  First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987).  Second, it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u>; <u>Clark v. Mitchell</u>, 425 F.3d 270, 283 (6th Cir. 2005) ("[C]laims regarding <u>Miranda</u> waivers must demonstrate not only that the confession was voluntary but also that the confession was knowing and intelligent.").  "To determine whether the confession was knowing and intelligent, we apply a totality of the

-31-

circumstances test to ascertain whether [defendant] understood his right to remain silent and to await counsel." Clark, 425 F.3d at 283. The government bears the burden of proof and must show by a preponderance of the evidence that Avery's Miranda waiver was knowing and voluntary. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

The court concludes that Avery's Miranda waiver was made knowingly, intelligently, and voluntarily. As an initial matter, the court recognizes that the testimony of Detective Moses and Avery directly contradict each other. Detective Moses testified that he read the Miranda Advice of Rights form out loud to Avery "line by line" and that Avery stated he understood his rights, whereas Avery testified that the detectives never read those rights to him. Detective Moses testified that after Avery gave his statements, he read the statements back to Avery question by question to verify their accuracy, whereas Avery testified that the detectives never did that. Avery testified that the only reason he agreed to speak to the detectives and signed the written statements was because they promised him that they would not charge his wife, whereas Detective Moses denied any such promises were made. Based on the entire record – including but not limited to the court's observations of the witnesses as they testified, the motives of the witnesses in testifying, certain inconsistencies between Dr. Hutson's findings contained in his April 24 letter and Avery's

-32-

testimony regarding his mental abilities, and the evidence indicating that Avery attempted to downplay his role in the offenses when evaluated by Dr. Adams and exaggerated the severity of his mental impairments when evaluated by Drs. Adams and Cochrane – the court finds the testimony of Detective Moses to be credible and the testimony of Avery to be not credible.  Because the court credits the testimony of Detective Moses, it concludes that Avery's waiver was made voluntarily.  Avery was notified of his Miranda rights before any police questioning started, stated that he understood those rights, was never promised that his wife would be released if he confessed, and waived his rights before giving each statement.  There is simply no credible evidence that Avery's Miranda waiver and statements were obtained as a result of any overreaching or coercion on the part of the police.

The court further concludes that Avery understood his Miranda rights and knowingly and intelligently waived those rights.  First, at the time of the interrogation, the detectives had no indication that Avery's "age, experience, education, background, and intelligence" may have prevented him from understanding the Miranda warnings.  Garner v. Mitchell, 557 F.3d 257, 262 (6th Cir. 2009) (en banc).  "The underlying police-regulatory purpose of Miranda compels that [the totality of the circumstances surrounding the interrogation] be examined . . . primarily from the perspective of the police."  Id. at 263 (stating that because the officers "had no

-33-

reason to believe that Garner misunderstood the warnings, and because it is undisputed that the officers were otherwise reasonable and careful in giving the warnings and obtaining the confession, there is no basis for invalidating Garner's <u>Miranda</u> waiver").[20]

According to Detective Moses, Avery stated that he understood his <u>Miranda</u> rights and did not appear to have any problems understanding what was going on.  Other than exhibiting some difficulty with reading, Avery did not exhibit any outwardly observable indications that he did not understand the warnings or the circumstances surrounding his interrogation.  As was the case in <u>Garner</u>, "[n]othing in the record indicates that [defendant] verbally expressed a misunderstanding to police officers or otherwise engaged in conduct indicative of a misunderstanding." <u>Id.</u> at 261.  Indeed, Avery's conduct in committing the robberies as well as the detailed nature of the statements themselves further demonstrate that Avery had the capacity to understand the criminal nature of his actions and consequences of those actions.  <u>Id.</u>  For example, he admitted acting as the getaway driver in the AmSouth Bank robbery, told the detectives he wore "a red Scarface short sleeve t-shirt, black jeans and a black coat with fur around the

---

[20]Although <u>Garner</u> involved a petition for habeas corpus relief, the majority made clear that its analysis and conclusion would have applied "regardless of whether we reviewed the issue de novo, under a deferential AEDPA standard, or under a 'modified AEDPA' standard." <u>Id.</u> at 271.

hood" during the robbery, said that about $9,000 was taken during the robbery and he received $3,000 for his share, explained in detail what the other participants did during the robbery, and apologized for his role in the crime.[21]  With respect to the Credit Union robbery, Avery told the detectives that he and two other individuals committed the robbery while a fourth individual waited outside in the getaway van, said that he (Avery) was armed with a black and gray handgun which was later seized during the traffic stop, described the weapons that the other robbers carried, identified how much money was taken from the Credit Union and what his share was, and explained in detail how he and the others carried out the robbery, including his role in taking the gun from the security guard.  (5/1/09 Hearing, Ex. 3.)  According to

---

[21]Avery provided the following information about the AmSouth Bank robbery:

> We had saw a police officer at the light at Hollywood and James and once he left I drove down the street and pulled into driveway of the house just pass the bank and let them, "J.B." and "Nuke," out so they could walk down to the bank. They wanted me to pull beside the bank but I told them I was going to pull into the carwash.  I pulled into the first carwash bay and acted like I was washing my van and watching for them to come out.  Once I saw them coming out of the bank I opened up the door to the van for them to get in.  They ran and jumped into the van and we took off and got onto the expressway and went straight towards Millington.  We went to a lake in Millington so "J.B." and "Nuke" could take their clothes off and throw their jackets away.  The clothes are probably still there.

(5/1/09 Hearing, Ex. 2.)

Detective Moses, the information that Avery provided to the detectives was consistent with the facts obtained from other witnesses and the videotapes.  As the court explained in Garner, "[t]hat [defendant] had this capacity at the time that he committed the crimes suggests that, when questioned about those crimes on the next day, [defendant] also had the capacity to understand and appreciate the consequences of speaking to police about his criminal conduct." Id.; see also United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998); United States v. Solano-Godines, No. 96-10255, 1997 WL 407861, at *3 (9th Cir. July 21, 1997); United States v. Macklin, 900 F.2d 948, 952 (6th Cir. 1990).

Finally, the findings and opinions of the mental health professionals who evaluated Avery do not support Avery's contention that he failed to understand the Miranda warnings.  "It is well-established, in this circuit and others, that mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a Miranda waiver was knowing and intelligent." Garner, 557 F.3d at 264.  "[D]iminished capacity alone does not prevent a defendant from validly waiving his or her Miranda rights. . . . Rather, that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to the interrogation." Id.; see also Smith v. Mullin, 379 F.3d 919, 932-34 (10th Cir. 2004) (finding that defendant's Miranda waiver was knowing and

-36-

intelligent despite the fact that he suffered from borderline mental retardation and a clinical psychologist concluded he could not have waived his rights, as the psychologist also testified that defendant would understand the role of police officers and the concept of a criminal charge and defendant had previous experience with the criminal justice system).

As discussed above, Avery provided the detectives with very detailed and factually accurate statements about each of the four robberies and the Brady murder – statements that the court finds simply could not have been provided by someone with the level of diminished capacity that Avery purports to operate under.  Drs. Adams and Cochrane opined in their reports and at the hearing that the battery of tests administered to Avery while at the Butner Center demonstrated that he was exaggerating his symptoms.  Dr. Adams further believed that during her interviews with Avery, he adopted "bogus symptoms," attempted to minimize his role in the crimes, and blamed his conduct on "voices" in his head – auditory hallucinations that up to that point had only been reported by Avery to professionals as being depressive in nature.

According to his school records, there was no indication that Avery was ever diagnosed with a learning disability or received special education services, he received average to below average grades up to the tenth grade (at which time he dropped out of school), and although he told Dr. Cochrane that he could not read,

-37-

he later described writing a letter to his wife. (5/27/09 Hearing,
Ex. 14 at 2-3.)  As for the gunshot wound to his head in 1999,
which Avery apparently attributes as causing the onset of his
mental problems, the medical records indicate that the bullet did
not pierce the dura, postoperatively Avery's hospital stay was
unremarkable, and a psychiatrist who saw Avery after the surgery
noticed no cognitive deficits or indication of a psychiatric
condition. (Id. at 3-4.)  While Drs. Adams and Cochrane diagnosed
Avery with Schizophrenia, they opined that he had a "mild" or "low
level" form of the disorder which was largely in remission.

The testimony most favorable to Avery was provided by Dr.
Hutson, and even he opined that Avery would have understood the
Miranda warnings administered by Detective Moses.  Dr. Hutson based
his opinion on Avery's understanding of the role of a lawyer and
Avery's experience with the criminal justice system through his
prior arrests.  The court agrees with Drs. Adams and Cochrane in
their opinions regarding the accuracy of the WAIS-IV test
administered by Dr. Bishop, as there is no evidence that any
motivational assessment was done in conjunction with that I.Q. test
and, as evidenced by Dr. Hutson's own evaluation, Avery was in fact
able to respond correctly to a variety of questions when motivated
to do so by the examiner.  The court concludes that Avery's conduct
during and leading up to the interrogation by the detectives
indicated that he understood and appreciated his Miranda rights

-38-

before executing the waiver.  <u>Garner</u>, 557 F.3d at 270.

### III.   RECOMMENDATION

For the reasons above, it is recommended that the motion to suppress be denied.

Respectfully submitted,

<u>s/ Tu M. Pham_____</u>
TU M. PHAM
United States Magistrate Judge

<u>November 4, 2009_____</u>
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**